Wilds agt. Hudson River Railroad Company.

# COURT OF APPEALS.

## CHRISTINA WILDS, administratrix, &c. agt. THE HUDSON RIVER RAILROAD COMPANY.

The right to recover damages under the statute, for *injuries to the person*, depends upon two concurring facts: 1st. The party claimed to have *done the injury* must be chargeable with *some degree of negligence*, if a natural person; if a corporation, with some degree of negligence on the part of its agents or servants.

2d. The party *injured* must have been *entirely free* from any degree of negligence which contributed to the injury. That is, of *any* negligence without which the injury would not have happened.

These essential elements of such a cause of action are as absolutely distinct from and independent of each other as are the two opposing parties, and each and both must be *by itself* in the case upon the evidence, or there can be no recovery.

The question presented to the court or the jury is never one of *comparative negli gence*, as between the parties; nor does very great negligence on the part of a defendant so operate to *strike a balance of negligence* as to give judgment to a plaintiff whose own negligence contributed *in any degree* to the injury.

As to the claim that the question of negligence belongs peculiarly to the *jury*; and that cases involving that question should never be taken from them to be decided by the court, *held*, that there is no case known to the law in which an appellate court has not and does not on proper occasions exercise the power of setting aside the verdict of a jury, not merely when it is entirely against evidence, but when it is *clearly against the weight of evidence*.

And no court can be guilty of the absurdity of holding that in such a case it would not have been competent for the judge who tried the cause, either to *non-suit* the plaintiff, or direct a verdict in his favor, as the case might have required. No legal principle compels the judge to allow a jury to render a merely *idle verdict*.

*Held*, in this case, that the entire evidence failed utterly to show any degree of negligence on the part of the defendants, and the motion for a *non-suit* made by the defendants at the close of the trial, *should have been granted*. (*Approving and sustaining the decision in* Steves agt. Oswego & S. R. R. Co., 18 N. Y. R., 422.)

Where the defendants requested the court to charge "that if the negligence of the deceased in any way contributed to cause the collision which resulted in his death, the plaintiff could not recover," *held*, that this request gave in precise words the true legal rule of the case, and the defendants were entitled to have it given to the jury substantially, as it was asked, *without qualification*, or to have it plainly refused.

Also, that another of the defendants' requests to charge claimed that "the deceased could not, by his own negligence, cast upon the defendants the necessity of extraordinary care," *held*, that the request stated a correct legal proposition, and the defendants were entitled to have it given to the jury substantially as stated. Other exceptions to the charge taken in connection with the evidence are given in the opinion.

*March Term*, 1862.

APPEAL from an order and from a judgment in this action, of the general term of the third judicial district.

> JOHN H. REYNOLDS, *for defendants, appellants.*
> WILLIAM A. BEACH, *for plaintiff, respondent.*

By the court, GOULD, J.   This case comes before us on two appeals; one from an order of the general term of the supreme court affirming an order of the special term, which denied the defendants' motion for a new trial, made on the minutes of the judge who tried the cause—that appeal bringing the case up as if on a case made.   The other appeal is from the judgment of the supreme court affirming the judgment rendered at the circuit on a verdict—this appeal bringing before us the exceptions taken by the defendants to different parts of the charge to the jury, and also the exceptions taken to the denial of the defendants' two motions for a non-suit; one made at the close of the plaintiff's testimony, the other made at the close of all the testimony.

The right to recover damages for this class of injuries to the person (whether asserted by the party injured or by his representatives under the statute,) depends upon two concurring facts : 1st. The party claimed to have done the injury must be chargeable with some degree of negligence, if a natural person ; if a corporation, with some degree of negligence on the part of its agents or servants.   2d. The party injured must have been *entirely free* from any degree of negligence which contributed to the injury ; *i. e.* of *any* negligence without which the injury would not have happened.

These essential elements of such a cause of action are as absolutely distinct from and independent of each other, as are the two opposing parties, and each and both must be *by itself* in the case upon the evidence, or there can be no

recovery.   The question presented to the court or jury is never one of *comparative* negligence as between the parties, nor does very great negligence on the part of a defendant so operate to *strike a balance of negligence*, as to give a judgment to a plaintiff whose own negligence contributed in *any degree* to the injury.

It is true that some of the reported cases of this kind of action use, in a very uncertain manner, the terms gross negligence, ordinary negligence, ordinary or common prudence, and similar terms.   But however applicable such terms may be to the cases of bailment of *property*, and between the different well-known classes of such bailors and bailees, it is difficult to see how they have strictly and legally *any* application to cases like the one under consideration.   No element of fraud (or *quasi* fraud,) or willfulness enters into the cause of action.   (*See Wells* agt. *N. Y. Central R. R. Co., decided last term.*)   The law says to the defendants, if you have by simple negligence caused this injury, so far as you are concerned the ground of action is complete.   At the same time it says to the plaintiff, although so far as the defendants' acts are concerned the case is made out, *you* cannot prevail if you have, by *your* simple negligence, helped to bring about the injury.   In the words of Judge SELDEN, (in the unreported case of *Bernhardt* agt. *Rens. & Sar. R. R. Co.,*)\* " if it appears that the party injured was guilty of *any negligence* which contributed to the injury, there can be no recovery."

Another preliminary point (to be passed upon generally before we can decide as to its being applicable to this case) is the claim that the question of negligence belongs peculiarly to the jury ; and that cases involving that question should never be taken from them to be decided by the court.   To this position it should be answered, that there is no case known to the law (even the question of *fraud* in

---

\* Now reported, 23 How. Pr. R., 166.

certain cases where the statute says it is to be submitted to the jury,) in which an appellate court has not and does not on proper occasions exercise the power of setting aside the verdict of a jury, not merely when it is entirely against evidence, but when it is clearly against the weight of evidence. And no court can be guilty of the absurdity of holding that in such a case it would not have been competent for the judge who tried the cause, either to non-suit the plaintiff or direct a verdict in his favor, as the case might have required. No legal principle compels him to allow a jury to render a merely idle verdict.

The full extent of this position has been held by this court (*Johnson* agt. *Hudson R. R. Co.*, 20 *N. Y. R.*, 73,) in saying that " *to carry a case to the jury*, the evidence on the part of the plaintiff must be such as if believed, would authorize them to find that the injury was occasioned *solely* by the negligence of the defendants." Judge SELDEN, in the case above named, of *Bernhardt* agt. *Rens. & Sar. R. R. Co.*, says : " Cases may no doubt arise in which the proof of negligence would be so clear and irresistible, that the court would be justified in assuming, *without submitting the question to the jury*, that negligence was established." Can this be true, without holding that in every case where a verdict would be set aside as against the clear weight of evidence, the court should take the decision of the case from the jury. Certainly, it is not easy to conceive any other definite position which would be consistent with the decisions. (*See also*, 18 *N. Y. R.*, 422.)

Nor is the applicability of the rule varied by saying that the evidence may consist of *circumstances*, from which inferences are to be drawn as to negligence ; and that as different minds may draw different inferences from the same circumstances, the jury must always be the judges of negligence where the evidence is circumstantial. No one ever supposed that the right of a tribunal of review, to reverse a verdict as against the weight of evidence, was confined

to the cases of direct, positive testimony. The right covers · all cases, by *whatever kind* of legal evidence any of them are sought to be proved, and it proceeds according to the weight of *the evidence*, whether circumstantial or not. If the circumstances are such that from them can be drawn two opposing inferences, either one equally consistent with the proof, it is no argument against the rule ; but the case is one where there is *not* a *clear* preponderance of evidence either way, and the rule is simply inapplicable. Still, in precisely such a case, (*Catlin* agt. *Wood*, 98 *Eng. Com. Law Rep.*, 566,) it has been explicitly held that the court should non-suit, because negligence on the part of a defendant (as care on the part of a plaintiff in another case cited, *post*,) must be *made to appear* by the evidence. This case says : " The judge will not be justified in leaving the case to the jury, where the plaintiff's evidence is equally consistent with the absence as with the existence of negligence in the defendant." But there are many cases in which care, or the want of it, is unmistakably apparent on the face of the circumstances. To walk within six inches of the curb- · stone of a side-walk, is not careless ; but to walk as near the edge of a precipice, is the act of a madman. Let us examine this upon both points ; the rule as to negligence on the part of the person injured, and that as to the duty (as well as the right) of a court to pass upon the question and non-suit. There are three strong cases ; one in 91 *Eng. Com. Law Rep.*; one in 29 *Conn. Rep.*, and one in 1 *Allen* (*Mass.*) *Rep.*, 187. The *Conn.* case (*at pp.* 208–9) says, that the rule that the party injured must have acted with ordinary prudence, is a stern, unbending rule, which has been settled by a long series of adjudged cases, and must be considered as well settled law ; and the decision set aside a verdict as against the evidence as applied to this rule ; and that was a case where it was conceded that the defendant was negligent. The case in 91 *Eng. Com. Law Rep.*, (*pp.* 148–9,) affirmed a non-suit, because (though

Wilds agt. Hudson River Railroad Company.

there was some evidence that defendant's servant was neg-
ligent) there was not evidence enough to take the case to
the jury. While the case in 1 *Allen*, (*pp.* 187–90,) lays
down as the undoubted law (of Massachusetts) that the
plaintiff must show " by affirmative proof that he was in
the exercise of due care," and for failure of such proof the
court should, as it did, non-suit. Let us examine this case
upon the principles of all but the last case (not passing
upon that.)

What proof is there, of want of care on the part of the
defendants? So far as the plaintiff's witnesses are con-
cerned, one man, a tin-pedler, who stood by his tin wagon,
some five rods from the track, talking with a woman to
whom he was trying to sell his tinware, says he first heard
the whistle a very short time before Wilds was struck by
the engine, or almost at that instant, and that he heard the
bell of the engine before the engine was in sight. That
Wilds drove on to the track as the train was coming, and
was nearly across it when he was hit. That the train was
coming fast for that part of the track, where it does not
generally go fast. He is the plaintiff's only witness who
saw the occurrence, and he says he did not see a flagman
there. The point of collision was at the crossing of the
railroad track and Fourth street, in the lower part of the
city of Troy. The time noon-day. Carroll (a passenger
on the train) called for the plaintiff; says he can't tell how
fast the cars were then running; they were running very
rapidly, he thinks. Eddy testifies as to the measurement
of distances only; chiefly as to how far up the track a
person could see from Fourth street below the track; and
says a man sitting in a wagon twenty-five feet south of the
south track, in the centre of Fourth street, could see the
cars at a distance of six hundred and fifty feet. Gifford
testifies that from the point of collision to the point where
the train was stopped after the collision, was about four
hundred feet. This is all the plaintiff's evidence on the

subject. ▲No proof was offered to show any rate of speed, or whether " fast for that part of the track," or (what the witness thought) " very rapidly," was six miles an hour or any other rate ; and no evidence was offered to show within what distance a train could be stopped when going at *any* specified rate of speed.

This evidence proves these facts : That the defendants complied· with the statute by giving the warning of the bell, so that it was heard by the plaintiff's only witness at · a distance sufficient and in time sufficient to give abundant notice to all persons to keep off the track. That at the time of such warning, and as the train was approaching the crossing, Wilds was not (nor was any one) upon the track, for the engineer to see him and check his train ; and that the engine ran against an object which was put upon the track suddenly (on a trot,) and when the engineer had no reason to anticipate or try to avoid hitting it. It would seem difficult to say that here was any proof of any negligence of the defendants. And negligence, like any other ground of action, must be proved. Add to this the defendants' evidence. Orr testifies that he heard the whistle before the flagman went to his position, and of course, from the whole evidence, this was the long, warning whistle (as a signal of an approaching train,) not the short, sharp whistle for stopping, which was but the instant before collision. Maria Banker heard the whistle and bell before Wilds came up to the track. These two witnesses had no connection with the railroad company. Agan, the flagman, heard both whistle and bell before he went from his flaghouse to the flagman's station upon the crossing. Young, the conductor, testifies to the sounding of the long, warning whistle as far off as the bridge above the hospital. Gregory, the engineer, says the whistle was sounded above the hospital, and the bell was ringing all the time from the depot to the crossing in question (half a mile.) Porter, the fireman, says he rang the bell all the way down, and

the whistle was sounded above the hospital. Van Hoesen, the brakeman, says the whistle was sounded and the bell rung through the cut (which terminates at the hospital.) Roarke, baggage-master, says the long whistle was blown long before they got to the place of collision. Thus, eight witnesses, not in any way discredited (by cross-examination or otherwise,) two of whom had no bias for the defendants, establish affirmatively that the company did give the proper warning of approach; and as to that point, it is beyond controversy that there was no negligence on the part of the defendants.

As to speed : Young thinks it about five miles an hour. Gregory says it was about five or six miles an hour. Porter says about six miles an hour, as estimated to the best of his knowledge. Roarke says about six or seven miles an hour. It is proved that the rails were slippery from recent rains, which rendered stopping quickly difficult. But there is no proof as to the distance required for stopping a train at any rate of speed; and even if the rate of speed might have something to do with the question of defendants' want of care, there is no shadow of proof that it did.

The only other point on which the plaintiff's case made even a suggestion of negligence on the part of the defendants is, that the one witness, Gillespie (the tin-pedler) says " there was no flagman there that he could see." On this point he is unquestionably in error. Porter, Orr, Maria Banker, O'Brien, Agan (the flagman,) Ware, six witnesses, four of whom were unconnected with the company, testify not merely to the flagman's being there, but to his making abundant signals of an approaching train, and being nearly run over, actually hit, by the team of Wilds. Due care in this respect is abundantly, overwhelmingly proved. Nor is it at all material to this point of due care, whether the flagman, being on the track and waving his flag as a signal, was directing his particular attention to keeping back Wilds, or to keeping a woman and child out of danger. He

was there, making signals plainly visible to all; and that he could not attend to two at once, when both were bent on running into danger, was not his fault or that of the company. The men upon the engine tried to stop as soon as they saw any reason for stopping. Seeing the flagman in his place, to keep persons off the track, and there being no one on the track, they had no reason to suppose that any one would disregard all the usual warnings and get on the track directly under the engine. As soon as Wilds did this, they saw him, and attempted all possible means to avoid a collision; but it was then inevitable.

The entire evidence fails utterly to show any degree of negligence on the part of the company, and the second motion, for a non-suit, should have been granted.

On the other hand, how stands the proof of carelessness on the part of the deceased? The plaintiff's chief witness, the only one who saw the occurrence, says : " When I first heard the whistle, he was getting right on to the south railroad track with his horses. If he had stopped then, he would not have been hit. He could not stop very easily." He did whip his horses, and went across the south track and nearly across the north track; when on that track his wagon was struck.

The defendants' witnesses show a very strong case of carelessness, if not of utter recklessness, on Wilds' part. Orr testifies to the flagman being in the middle of the street, between the two tracks, waving his flag both ways, and that teams were checked by that, and waited. That O'Brien attempted to stop Wilds, by throwing up his hands and shouting at him, and that failing to stop him by these means, O'Brien stepped into the street and tried to catch his horses; Wilds drew up the reins, whipped up the horses, and went across the track, when the engine struck him. That Wilds' horses, in crossing, struck the flagman and turned him around two or three paces. That when O'Brien shouted to him, the horses were fifteen feet from

the south track, and coming upon a smart trot. Maria Banker says, that having heard the whistle and bell, she looked out of her window (which commands a clear view of the spot,) and saw the man approaching on a fast trot. She halloed to him to stop; he looked around; she halloed to him again; he whipped his horses; the flagman held his flag before the horses; the flagman was hit by the horses, and went down. When she halloed, the horses had not got on to the south track. O'Brien says the flagman was in his position, swinging his flag, and that seeing Wilds coming up on a trot, and knowing him, he started towards him to keep him back, holding up his hands to him for that purpose, and finally he tried to grasp the horses.; the horses passed him, went on the track, hit the flagman in the back, went on in front of the engine, and the collision occurred. Agan, the flagman, says he was in his proper place, waving his flag; that his immediate attention was taken by a woman with a child in her arms, whom he was keeping off the track, when Wilds' team struck him as he was standing on the south track, and he barely escaped with his life. Ware was further off; he saw the flagman there, and says he was trying to keep Wilds back, and that Wilds kept pushing up and hit the flagman. He says the flagman was *facing* Wilds—an error not very remarkable in the confusion, and not important, since he confirms the facts that the flagman was there, and was struck by the team. It is further in evidence that the railroad had been in operation there some eighteen months, and that Wilds was well acquainted with the city, came to it every Saturday to supply his customers with the produce of his farm (which was some twelve miles out,) and that on this day he had gone to South Troy, across this very track, to a customer's house; so that he knew the railroad was there, and all about the crossing. Is it possible, from all this body of direct evidence, to draw two inferences? Can there be a doubt that Wilds knew the train was coming,

and prepared to take his chance of speed's insuring his safety ? Or if there can be any doubt of this, is it not inevitably certain that all the appliances of caution proved to have been used, must have made him aware that there was *something unusual* at that point, calling on him for at least sufficient attention to look about him, and find out what it was—so far, at any rate, as not to run over a man, who, for some purpose, and with a signal flag, was standing in the street and directly in his way ? If his horses were at all troublesome to manage (though there is no proof that they were, until they were actually on the south track and near to the engine, before which, he had notice enough to pause,) there were men enough on the spot, ready and able to assist him in holding them, and one man tried to hold them back, not being called on. If Wilds was careful, it would be difficult to imagine a case of want of care. The case is much stronger than that of *Steves* agt. *The Oswego & S. R. R. Co.*, (18 *N. Y. R.*, 422–7,) in which this court sustained a non-suit, and that case remains the law of the state.

It is quite usual in similar suits to find counsel, and sometimes judges, disposed to dwell upon the alarming power of a locomotive, and the appalling danger of running one anywhere but in the wilderness ; and great stress is laid on the strict and untiring watchfulness and care that are required of those who use so dangerous a thing. All this is very true. But there are two sides to these facts. If a locomotive be eminently dangerous, everybody knows it to be so ; and it is as dangerous to run against or under it, as to have it run over you. A railroad crossing is known to be a dangerous place, and the man who, knowing it to be a railroad crossing, approaches it, is careless, unless he approaches it as if it were dangerous. To him the danger is vastly greater than it is to the locomotive. He may lose his life ; and if the company be bound to use very great care not to endanger him, why is he not bound to

use equally great care not to be endangered? His care should be as much graduated by the danger as the company's. When every one who knows that the railroad is there, is bound to know and remember that a train may be approaching, not to take the very simple precaution of looking and listening to find out whether one is coming, cannot but be want of care. To be sure, the statute requires a railroad company to give specified warnings, but it neither takes away a man's senses nor excuses him from using them. (18 *N. Y. R.*, 425–6.) The danger may be there—the precaution is simple. To stop to pause is certainly safe. His time to do so is before he puts himself in " the very road of casualty." And if he fails to do so, it is of no consequence in the eye of the law, whether he merely misjudges or is obstinately reckless. His act is not careful, and he is to abide the consequences, and not the company, under or into whose train he sees fit to run—whether he did so in inexcusable ignorance or in the belief that he could run the gauntlet unharmed. Nor is the court to look about to find how he, after putting himself there, conducted; whether he then took the best means of escape, or in his confusion ran more helplessly into the jaws of death. No degree of presence of mind, and no want of presence of mind at that time, has anything to do with the case. He should not be there by want of care.

Much weight is given to the fact that the place of such collision is a highway, and that the traveler has a right to be there with his vehicle. Certainly it is a highway, or he would have no right to be there at all; and he could not recover, no matter what might be the negligence of the company. Further, it is a part of a railroad track, and the train has a right to be there. It is a place in which two easements have a common right; and it is the right of the public that both shall be so enjoyed as not unnecessarily to interfere with or abridge the right of either.

A sound and reasonable view of cases of this description

is of as much importance to the public as it is to the railroad companies. Such corporations are to be treated precisely as any other party to a suit. No more stringent rule is to be applied to them than is applied to individuals, nor is any less stringent one. Every citizen of the state has a deep interest in the existence and successful operations of such companies. The facilities of travel which they afford; the means they give of accumulating and of diffusing the products of our wide land and of our vast commerce, have already produced the mightiest results in the development and unparalleled increase of the resources of the nation. They have clothed us with the richest garments of peace, and they have multiplied our armies and wielded our weapons of war. To do this, they have needed these powerful means, the use of which is necessarily accompanied with danger. But as the public has the benefit of those means, it is bound to incur its own share of that danger. A mutual duty is enjoined, and a mutual liability results from a failure to perform that duty; and a party who fails in performing his own part thereof, is in no condition to enforce the penalty of a breach on the other party.

Having considered the points embraced in the appeal from the order denying a new trial on the merits, we come to the exceptions contained in the appeal from the judgment.

The first exception to the charge of the judge is thus taken : Defendants requested the court to charge, " that if the negligence of the deceased in any way contributed to cause the collision which resulted in his death, the plaintiff cannot recover." The request was so far complied with as to give the charge in the terms asked; qualifying it with the words " it being understood that this negligence is the want of such care as a person of ordinary prudence would exercise in like circumstances." The defendants asked for his single, definite legal proposition, and excepted to having it accompanied by any addition, to give it uncertainty, or

tending to confuse the minds of the jury. And if their request contained a legal proposition which, unqualified, was sound or applicable to the case, they had a right to have it announced to the jury, if not in the very terms asked, at least substantially so, and not so qualified as to alter the principle or to add to it in any way, to render it uncertain or tending to confuse the jury, or he should have it refused, either directly or on the ground that the charge already given has properly covered the law of the case. And while a juryman might suppose that he knew what, in the circumstances proved, constituted "negligence," he might be puzzled with so utterly indefinite a qualification; especially as in a prior part of the charge, the jury had been told to consider, in estimating what would be negligent in Wilds' approach to the crossing, whether he *understood* the signals. Thus putting on the company the obligation, not merely of making the signals, but of furnishing understanding to the other party.

The defendants' request certainly gave, in precise words, the true legal rule of the case, and they were entitled to have it given to the jury substantially as they asked it, without qualification, or to have it plainly refused.

The defendants' next request to charge was, " that if the deceased approached the crossing, knowing the position of the railroad, and that trains were frequently run thereon, at such a rate of speed that he was unable to stop his horses before actually getting upon the track, and that speed contributed to cause the collision, the plaintiff cannot recover." This, inasmuch as the charge had already, as against the defendants, included the element of speed as constituting negligence, and had said " the speed should be regulated with reference to the apparent danger," this would seem to be an entirely proper request, that each party might be held to looking out for the apparent danger. It was refused, except with the qualification that the defendants must have " used all proper precautions to notify

travelers of the approach of the trains" (with other quali-
fications as to ordinary prudence,) which is equivalent to
saying that the want of care of Wilds depended upon the
exercise of care by the company, and that he might ap-
proach a dangerous place with utter recklessness, unless
the company used all care, while the company must ap-
proach the same place " with all proper precaution," or be
liable, not merely for its want of care, but for that of all
comers. This is too unequal to be sound. Each one's care
or want of care exists in his own act, without the slightest
reference to care or the want of it in the other party. Each
is governed by his own independent volition, with which
the other can by no possibility have any connection; and
on the exercise of that volition by each, and on that only,
depends the act which is either careful or not.

A further request to charge on the part of the defend-
ants, contained the proposition " that if the deceased was
aware of the approach of the train in time to have stopped
before reaching the track upon which the train was ap-
proaching, and intentionally drove upon the track after
being aware of the train, the plaintiff cannot recover." The
court refused to charge in this form. The request covers
this ground—that if the deceased, knowing that a train
was approaching in season to take his own course, and
decide whether to be safe and stop, or to go on and run
his chance, chose to go on, he must abide the risk that he
took. It is rather difficult to see why this is not law.
Certainly no legal rule is consistent with qualifying the
position, by leaving it with the jury to speculate on the
idea whether he " would have stopped in the exercise of
reasonable care," &c., " and could not reasonably expect to
pass in safety, and intentionally drove upon the track," &c.
This limits the negligence on his part, to a grade little
short of suicide.

Another of the defendants' requests to charge, claimed
that " the deceased cannot, by his own negligence, cast

upon the defendants the necessity of exercising extraordinary care." The court added after the word " negligence," " as above defined, and contributing to the injury." The request seems to state an accurately correct legal proposition, and the defendants were entitled to have it given to the jury, as herein before stated.

The judgment of the supreme court and its order should be reversed, and a new trial granted. Costs to abide event.